# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **ANNA WEATHERLY and PAMELA CHARNEY**, on behalf of themselves and all others similarly situated, | Case No. |
| *Plaintiffs,* | |
| v. | **PLAINTIFFS' COMPLAINT AND JURY DEMAND** |
| **CLEVELAND CLINIC FOUNDATION**, a nonprofit corporation organized under the laws of Ohio, and **CLEVELAND CLINIC FLORIDA HEALTH SYSTEM NONPROFIT CORPORATION**, a nonprofit corporation organized under the laws of Florida, | |
| *Defendants* | |

## CLASS ACTION COMPLAINT

Plaintiffs Anna Weatherly and Pamela Charney ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint ("Complaint") against Defendants Cleveland Clinic Foundation and Cleveland Clinic Florida Health System Nonprofit Corporation (collectively, "Cleveland Clinic" or "Defendants"), and allege as follows based upon personal

knowledge as to Plaintiffs' own acts and experiences, and upon information and belief, including investigation by counsel, as to all other matters:

## NATURE OF THE ACTION

1.    This is a class action lawsuit arising from Cleveland Clinic's systematic interception and disclosure of patients' and website visitors' sensitive personal health information and electronic communications to third parties, including Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX, without prior notice or consent, through tracking technologies embedded in Defendants' website, www.clevelandclinic.org ("Website").

2.    Cleveland Clinic is a leading nonprofit academic medical center headquartered in Cleveland, Ohio, operating 319 locations worldwide, including five hospitals and 50 locations in Florida; 16 hospitals and more than 250 locations in Ohio; and two locations in Nevada. Through its Website, Cleveland Clinic allows visitors to search for physicians and medical facilities, explore health conditions, schedule appointments, and access other healthcare services

3.    Unbeknownst to Website visitors, Cleveland Clinic has knowingly implemented multiple third-party tracking technologies on its Website, including the Adobe Experience Platform Edge Network, Google DoubleClick, Amazon Advertising, Magnite (Rubicon Project), Casale Media, and OpenX trackers

(collectively, the "Trackers"). When Website visitors search for doctors or medical specialists, research health conditions, seek information about specific medical services, or interact with other health-related content, Cleveland Clinic enables these third parties to intercept these electronic communications without consent.

4.     The intercepted information includes: (a) the names, genders, languages, specialties, and locations of physicians from whom users are seeking treatment; (b) users' health conditions and medical concerns; (c) the locations or facilities where users are seeking treatment; (d) the types of medical services or procedures users are seeking; (e) users' navigation to the patient portal; (f) search queries containing sensitive health information; and (g) users' attempts to schedule appointments or contact healthcare providers.

5.     This interception of private electronic communications occurs in real-time, without appropriate notice to visitors and without obtaining their consent, in violation of: (1) the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511 et seq.; (2) the Florida Security of Communications Act ("FSCA"), Chapter 934.03, Florida Statutes; (3) common law protections against invasion of privacy; and (4) principles of unjust enrichment.

6.     Through this action, Plaintiffs seek to remedy these widespread privacy violations on behalf of a nationwide class, obtain appropriate remedies for

millions of affected individuals, and prevent the continued unauthorized interception of patients' electronic communications through Defendants' Website.

## PARTIES

7.      Plaintiff Anna Weatherly is a natural person and citizen of Florida who resides in Dania, Florida.

8.      Plaintiff Pamela Charney is a natural person and citizen of Florida, who resides in Deerfield Beach, Florida.

9.      Defendant Cleveland Clinic Foundation is a nonprofit corporation organized under the laws of Ohio, with its principal place of business at 9500 Euclid Avenue, Cleveland, Ohio 44195. Cleveland Clinic Foundation operates the Website at issue and controls the implementation of tracking technologies on that Website.

10.     Defendant Cleveland Clinic Florida Health System Nonprofit Corporation is a nonprofit corporation organized under the laws of Florida, with its principal place of business at 2950 Cleveland Clinic Boulevard, Weston, Florida 33331. An operational division of the Cleveland Clinic Foundation, it maintains facilities throughout Florida where it provides healthcare services to Florida residents.

## JURISDICTION AND VENUE

4

11.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005  ("CAFA"), 28 U.S.C. § 1332(d), because: (a) this is a class action involving more than 100 class members; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) minimal diversity exists because at least one member of the proposed class is a citizen of a state different from at least one Defendant.

12.     This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law, specifically the Electronic Communications Privacy Act, 18 U.S.C. § 2511 et seq.

13.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy.

14.     This Court has personal jurisdiction over Defendant Cleveland Clinic Foundation because it conducts substantial business in Florida through its fifty facilities in the state and purposefully avails itself of the privilege of conducting activities in Florida.

15.     This Court has personal jurisdiction over Defendant Cleveland Clinic Florida Health System Nonprofit Corporation because it is a Florida corporation with its principal place of business in Florida.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the interception of Florida residents' electronic communications through the Website.

## FACTUAL ALLEGATIONS

i.     *Overview of Website Tracking on Healthcare Websites*

17.     Many websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become increasingly sophisticated, evolving from simple cookies to complex tracking systems that can monitor detailed user behavior across websites and devices.

18.     Website-tracking technologies typically function by placing small pieces of code on websites that are downloaded to a user's browser when they visit the site. Invisible to website users, this code enables the collection of various types of data about the user's interactions with the website, which is transmitted to third-party servers. Only those with technical expertise who actively inspect a website's source code or transmissions would detect the presence of these tracking codes and technologies.

19.     The most basic form of website tracking involves cookies, which are small text files stored on a user's device that identify users and their browsing

activity. First-party cookies are placed by the website the user is visiting directly, while third-party cookies are placed by domains other than the one the user is visiting. These third-party cookies enable tracking across multiple websites and are commonly used for advertising and analytics purposes.

20.     JavaScript-based trackers represent a more sophisticated tracking method. Website owners implement these trackers by embedding JavaScript code snippets into their website's source code. When a user loads a webpage containing such code, the tracker is downloaded onto the user's browser, where it activates and collects data about user behavior, which is then transmitted to the tracker provider's servers in real-time.

21.     The interception of healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

22.     As detailed in this Complaint, Cleveland Clinic has implemented such tracking technologies on its Website, resulting in the unauthorized interception of visitors' electronic communications by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX.

ii.     *The Adobe Experience Platform Edge Network*

23.     Adobe Inc. ("Adobe") is a multinational technology company headquartered in San Jose, California, that operates one of the world's largest digital marketing and analytics platforms. With annual revenues exceeding $20 billion, Adobe's business model includes its Experience Cloud suite of products, which enables businesses to collect, analyze, and monetize user data across digital touchpoints. Adobe's marketing technology is used by thousands of companies worldwide to track user behavior, build detailed consumer profiles, and deliver targeted advertising.

24.     Adobe offers website operators a sophisticated tracking infrastructure known as the Adobe Experience Platform Edge Network (the "Adobe Tracker"). Website administrators implement this tracking system by adding a snippet of JavaScript code to their website, typically in the header section of the site's code.

25.     Once implemented, the Adobe Tracker loads automatically and immediately whenever a user visits any page containing the tracking code. The tracking operates completely invisibly in the background without any indication to users that their communications are being intercepted. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms. The surreptitious nature of the Adobe Tracker means that users typically have no idea

8

that their electronic communications are being intercepted and transmitted to Adobe.

26.    The Adobe Tracker operates through scripts that instruct users' browsers to transmit data to Adobe-controlled servers via the domain "edge.adobedc.net". Through this process, Adobe intercepts and processes user interactions with websites, capturing detailed information about user behavior and preferences.

27.    When users interact with websites that include the Adobe Tracker, Adobe assigns multiple persistent identifiers stored as third-party cookies on users' devices. The primary identifier is the Experience Cloud ID  ("ECID"), a unique alphanumeric string that serves as a persistent digital fingerprint for each visitor across Adobe's entire ecosystem of products and services.

28.    The ECID functions as far more than a simple session identifier or analytics tool. According to Adobe's technical specifications, this identifier enables Adobe to: (a) uniquely identify visitors across multiple applications and websites; (b) track visitor behavior across domains through persistent cookies; (c) synchronize user identities with third-party partners across the advertising technology ecosystem; and (d) maintain persistent tracking even when users switch devices or browsers.

29.     Adobe implements the ECID through a third-party browser cookie named *kndctr_{ORG_ID}_AdobeOrg_identity* (the "Kndctr Cookie"), which contains user identity details and is transmitted with every request to Adobe's servers. For first-time visitors to a website, the Adobe Tracker's JavaScript code triggers the generation of a new ECID that is returned from Adobe's servers and stored in this cookie. For returning visitors, the existing ECID is retrieved from the Kndctr Cookie and included in all subsequent data transmissions to Adobe.

30.     This tracking architecture enables cross-device and cross-channel correlation of all user activities. Adobe maintains that with the ECID system, it can "track visitors across domains" and create "a single unified view of the customer's online activity." Even when users clear their cookies or use different devices, Adobe employs sophisticated digital "fingerprinting" techniques—including browser type, screen resolution, and IP address analysis—to re-identify returning users and link their activities to existing profiles.

31.     The ECID serves as the foundation of Adobe's Identity Graph system, which creates comprehensive user profiles by linking ECIDs with additional identifiers including hashed email addresses, customer relationship management records, loyalty program IDs, and other persistent identifiers. This unified profile follows users across the entire internet ecosystem wherever Adobe's tracking infrastructure is present.

32.    Adobe's data collection extends beyond simple analytics. The company's terms of service grant Adobe broad rights to use intercepted data, including a "worldwide, royalty-free, non-exclusive, transferable, and sublicensable license" to use materials that explicitly include "user material, including usage and telemetry activities" for "operating, marketing and improving the Services." This enables Adobe to leverage data intercepted from websites for its own commercial purpose

33.    The intercepted data flows directly into Adobe Audience Manager, where it is further processed to build behavioral audience segments specifically for targeted advertising. Adobe's documentation explicitly states that the ECID enables advertising activation across platforms, confirming that data intercepted from websites using the Adobe Tracker is incorporated into advertising profiles used throughout Adobe's vast partner network.

34.    As further outlined in this Complaint, Cleveland Clinic has implemented the Adobe Tracker on its Website.

iii.    *Google's DoubleClick Tracker*

35.    Google LLC ("Google") is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends

on collecting vast amounts of user data across its numerous products and services, including Google Search, Gmail, YouTube, and Android, which it then leverages to deliver targeted advertisements.

36.    Google offers website operators an advertising tracking tool called DoubleClick, a digital advertising platform that Google acquired and integrated into its advertising ecosystem as part of the Google Marketing Platform. Website owners implement the DoubleClick tracker by adding a snippet of JavaScript code to their website. This implementation process is simple, requiring only that the website administrator copy and paste Google's provided tracking code into the website's source code.

37.    Once implemented on a website, the DoubleClick tracker loads automatically and immediately whenever a user visits a page containing the tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms. The surreptitious nature of the tracker means that users typically have no idea that their electronic communications are being intercepted by Google.

38.     The DoubleClick tracker intercepts and collects various data points about user interactions with websites, including page views, clicks, form submissions, and other user activities. This data is transmitted in real-time to Google's servers, where it can be combined with data from Google's vast ecosystem to create comprehensive user profiles.

39.     Through the DoubleClick tracker, Google creates and assigns unique identifiers to website visitors through multiple cookies. The primary tracking cookie is the "IDE" cookie, which is unique to each user's browser and persists for approximately 13 months unless manually deleted. The IDE cookie contains a string of numbers and letters that uniquely identifies the user and is used to record user actions, measure ad effectiveness, and enable cross-site tracking. For users signed into their Google accounts when accessing websites with the DoubleClick tracker (such as through being logged in to Gmail or YouTube), Google also sets the "DSID" cookie, which is unique to that user's Google account and enables even more precise tracking by linking website activity directly to the user's Google profile.

40.     When creating a Google account, users are required to provide an email address, meaning that data collected alongside the DSID cookie can be linked by Google to an identifiable email address. Many users, however, also voluntarily provide additional identifying information to Google such as their full name, phone

13

number, home address, work address, profile photograph, and recovery email –
either during account creation or while using other Google services. As a result,
Google can associate the data collected from a user's visit to a website alongside
the cookies not only with an email address, but with a named and potentially highly
personalized user profile. This enables Google to link a user's private activity on a
website such as Cleveland Clinic's to their name and broader aspects of their digital
identity, particularly when combined with other data collected across Google's
ecosystem, such as Gmail usage, YouTube views, or Google Maps history.

41.    The DoubleClick tracker works in concert with Google's vast
advertising network, which spans millions of websites. When combined with
Google's other data sources, the information intercepted through the DoubleClick
tracker enables precise identification and tracking of individuals across the internet
ecosystem.

42.    Google combines data intercepted through the DoubleClick tracker
with other data points in its possession to create comprehensive user profiles that
can include detailed information about individuals' interests, behaviors, and online
activities. These profiles are then monetized through targeted advertising across
Google's advertising network.

43.    Upon information and belief, Google combines the sensitive health
information intercepted through the DoubleClick Tracker with other data points in

its possession (including data points obtained through its other tracking technology, including the Google Analytics Tracker) to create comprehensive user profiles that include intimate details about individuals' medical conditions, treatment interests, and healthcare-seeking behaviors. These profiles can then be monetized through targeted advertising that may reveal or allude to users' private health concerns.

44.    Cleveland Clinic has implemented Google's DoubleClick Tracker on its Website.

iv.    *Additional Third-Party Trackers*

45.    Cleveland Clinic has implemented numerous additional third-party trackers on its Website that intercept users' sensitive and health-related communications.

46.    *Amazon Tracker:* Cleveland Clinic has implemented the Amazon Tracker on its Website. Amazon.com, Inc. operates one of the world's largest e-commerce and digital advertising platforms. When websites implement Amazon's advertising services, they include JavaScript code that enables communication with Amazon's platform via the domain aax.amazon-adsystem.com. Upon page load, this code triggers requests to Amazon's servers, which then set a tracking cookie known as "ad-id" in the user's browser. The ad-id cookie uniquely identifies each user or device and enables Amazon to gather detailed information about browsing behavior, interests, and preferences. This data includes pages visited, ad

15

impressions, clicks, and other engagement metrics, which Amazon uses to deliver targeted advertising campaigns tailored to users' interests and behaviors across its vast advertising network.

47.   *Magnite Tracker:* Cleveland Clinic has implemented the Magnite Tracker on its Website. Magnite, Inc., formerly known as Rubicon Project, is a publicly traded digital advertising technology company that operates one of the world's largest independent sell-side advertising platforms. Websites implementing Magnite's services include JavaScript tags that communicate with Magnite's platform through requests to rubiconproject.com. When users visit these websites, Magnite's servers set a tracking cookie called "khaos" that contains a unique identifier (UID) consisting of a randomly generated string of characters. This cookie enables Magnite to collect and store comprehensive information about users' browsing behavior, interests, and preferences, creating detailed user profiles that track website visits, ad interactions, impressions, and clicks across Magnite's extensive publisher network.

48.   *Casale Media Tracker:* Cleveland Clinic has implemented the Casale Media Tracker on its Website. Formerly known as Casale Media, Index Exchange, Inc., is a global advertising marketplace that leverages deep advertising technology expertise to connect publishers and advertisers. The CasaleMedia.com tracker activates when users visit partnered websites, collecting user data to facilitate

personalized advertising. The tracker places a cookie named "CMID" (Casale Media ID) on users' browsers, which serves as a unique identifier consisting of a randomly generated string. This CMID constitutes personally identifiable information as it is unique to each user and enables Index Exchange to track individuals across websites, collecting information about browsing patterns that is subsequently used for targeted advertising across their platform.

49.    *OpenX Tracker:* Cleveland Clinic has implemented the OpenX Tracker on its Website. OpenX Technologies, Inc. is a programmatic advertising company that operates a leading advertising exchange platform connecting publishers and advertisers for real-time buying and selling of digital advertising inventory. OpenX uses advanced technology and data-driven insights to optimize ad performance and revenue. The company's "i" cookie, used for advertising purposes, contains a randomly generated string that identifies a user's device and includes a timestamp marking when the identifier was created. By matching information stored in this cookie with data collected across OpenX's network, advertisers can serve targeted advertisements based on users' interests and browsing behavior across multiple websites.

50.    Each of these tracking technologies operates through similar mechanisms: website administrators implement them by adding JavaScript code to their sites, the trackers then automatically load and execute invisibly when users

visit the websites, and they assign unique identifiers through cookies that enable persistent tracking across sessions and websites. These identifiers constitute personally identifiable information and enable the creation of user profiles that can be monetized through targeted advertising.

iv.     *Visitors to the Website Reasonably Expect Their Information to Stay Private*

51.     Cleveland Clinic operates its Website as an extension of its healthcare services, facilitating patient care and the provision of health information. The Website allows users and patients to search for physicians by name, specialty, location, and other criteria; schedule or request appointments with physicians; pay for medical services; obtain information about their medical conditions and treatments; and search for various medical institutions and services.

52.     When using these online services, visitors input their medical information, including private and confidential information regarding their medical conditions and treatment, with the reasonable expectation that such information will be kept confidential and used only for legitimate healthcare purposes.

53.     Users of the Website reasonably expect that their communications and activities will remain private, particularly given Cleveland Clinic's status as a healthcare provider subject to HIPAA, and other privacy regulations, as well as Cleveland Clinic's professional and ethical obligations to protect patient confidentiality.

54.     This expectation of privacy is reinforced by longstanding regulatory principles and enforcement actions in the healthcare sector. Federal privacy regulations have long recognized that health information is entitled to broad privacy protections. In 2013, HHS clarified through formal rulemaking that information need not contain specific medical terms to be protected under HIPAA: if it "is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity." 78 Fed. Reg. 5566, 5598 (January 25, 2013).

55.     Cleveland Clinic's conduct described herein is in violation of HIPAA, which imposes minimal penalties for knowingly disclosing individually identifiable health information ("IIHI") to third parties. 42 U.S.C. § 1320d-6(a)(3) defines IIHI as: "any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual."

56.     Cleveland Clinic intended to share and monetize its patients' IIHI, which is in violation of HIPAA and common law duties.

57.    In 2023, the Federal Trade Commission and HHS warned healthcare providers via letter about their obligations to protect against impermissible disclosures of personal health information through web-tracking technologies such as the Trackers discussed in this Complaint, emphasizing that unauthorized disclosure of such information through trackers can violate federal law.[1]  The letter warned that "technologies, such as the Meta/Facebook pixel and Google Analytics, [] can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users." "Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more." Thus, Healthcare providers such as Cleveland Clinic have been on notice that data such as IP addresses, search queries for doctors, or visits to pages about specific health conditions can constitute sensitive health information when connected to an individual seeking healthcare services.

---

[1] Federal Trade Commission, *Re: Use of Online Tracking Technologies* (July 20, 2023): https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

58.     This is particularly true for interactions that reveal an individual's online communications regarding specific symptoms, health conditions, medical specialists, or appointment scheduling, regardless of whether such interactions occur on authenticated (password-protected) or unauthenticated portions of a healthcare provider's website, which are IIHI.  The Trackers, as described above, personally identify individuals along with their protected health information instantaneously as they navigate the Cleveland Clinic website and input their health information.

59.     This expectation of privacy is further reinforced by Cleveland Clinic's Notice of Privacy Practices, which states: "[W]e will use your health information and disclose it outside Cleveland Clinic for treatment, payment, health care operations, and when required or permitted by law. We will not use or disclose your health information for other reasons without your written authorization." However, as detailed in this Complaint, this representation is false, as Cleveland Clinic shares users' medical information with Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX for advertising purposes without their knowledge or consent.

60.     Users would not reasonably expect that simply by visiting Cleveland Clinic's Website to search for doctors, schedule appointments, research medical conditions, or explore treatment options, their sensitive health information would

be intercepted by third parties like Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX for purposes unrelated to their healthcare needs.

*v.*    *Defendant's Implementation of the Trackers*

61.    Cleveland Clinic has deliberately implemented each of the Trackers in the source code of its Website, procuring Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX to intercept sensitive health information and electronic communications of its patients and Website visitors without proper consent.

62.    The Trackers operate on pages of the Website where users search for medical specialists, research health conditions, locate treatment facilities, schedule appointments, and where they click to enter their patient portal. The Trackers operate invisibly to Website visitors, who have no meaningful way of knowing that their sensitive health queries and browsing behaviors are being intercepted by third parties.

63.    The information intercepted through these Trackers includes electronic communications between the visitor and Cleveland Clinic regarding the visitor's healthcare interests, treatment-seeking behavior, and medical preferences. When combined with persistent identifiers (cookies), this information allows Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX to identify individual users and associate sensitive health information with their digital profiles.

64.     The persistent identifiers used by the Trackers create digital fingerprints that allow Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX to track individuals across multiple devices and browsing sessions, connecting their healthcare inquiries to broader online activities.

65.     Upon information and belief, Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX combine this intercepted healthcare-related data with information from its other services, creating comprehensive user profiles that include sensitive health information which can be used for targeted advertising and other commercial purposes.

66.     As demonstrated in the following examples, Cleveland Clinic procures the interception of sensitive personal health data without obtaining the consent required by the FSCA.

vi.     *Examples of Personal Data Collection and Disclosure on the Cleveland Clinic Website*

67.     Cleveland Clinic's implementation of these Trackers results in the systematic interception of highly sensitive health information. The following examples demonstrate the scope and nature of these privacy violations:

68.     **Physician Searches and Selection:** The "Find a Doctor" page on the Cleveland Clinic's Website allows users to enter general search terms, and then

filter the results  based on criteria such as city, department, gender, and languages. A list of matching providers is then displayed, and users can access individual profile pages by clicking on a doctor's name. The image below shows an example search on the Website, where a user searches for "diabetes" and filters results by city (Weston, FL), gender (female), and language (Hindi).[2]

---

[2] The images used in this complaint are examples provided for illustrative purposes to demonstrate the operation of the third-party trackers on Defendant's website.



69.     As shown in the image below, when a user uses the "Find a Doctor" search bar and filters, the search term (here, "diabetes") and the filters applied (here, location, gender of doctor, and languages of doctor) are automatically intercepted and transmitted to Adobe by the Adobe Tracker. This transmission includes the Kndctr Cookie containing the ECID, linking these sensitive medical interests to the individual user's digital profile.

25

| 106 | https://edge.adobedc.net | POST | /ee/va6/v1/interact?configId=d587... ✔ |

**Request**

Pretty    Raw    Hex

```
1  POST /ee/va6/v1/interact?configId=d587i08c-8e16-4fe0-a0c8-d8b99bbecbc2&requestId=
   fc14ba12-6fc3-45f5-b6f5-e1e73d9d6790 HTTP/2
2  Host: edge.adobedc.net
3  Content-Length: 1405
4  Cache-Control: max-age=0
5  Sec-Ch-Ua-Platform: "Windows"
6  User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko)
   Chrome/136.0.0.0 Safari/537.36
7  Sec-Ch-Ua: "Chromium";v="136", "Google Chrome";v="136", "Not.A/Brand";v="99"
8  Content-Type: text/plain; charset=UTF-8
9  Sec-Ch-Ua-Mobile: ?0
10 Accept: */*
11 Origin: https://my.clevelandclinic.org
12 Sec-Fetch-Site: cross-site
13 Sec-Fetch-Mode: cors
14 Sec-Fetch-Dest: empty
15 Sec-Fetch-Storage-Access: active
16 Referer:
   https://my.clevelandclinic.org/staff?q=diabetes&dFR[employedDescription][0]=Cleveland%20Clinic%20e
   mployed%20staff&dFR[gender][0]=Female&dFR[languages][0]=Hindi&dFR[practiceLocationAddressLocalityR
   egions][0]=Weston%2C%20FL
17 Accept-Encoding: gzip, deflate, br
18 Accept-Language: en-US,en;q=0.9
19 Priority: u=1, i
20
21 {
      "events":[
         {
            "xdm":{
               "eventType":"web.webpagedetails.pageViews",
               "web":{
                  "webPageDetails":{
                     "URL":
                     "https://my.clevelandclinic.org/staff?q=diabetes&dFR[employedDescription][0]=Cleveland
                     %20Clinic%20employed%20staff&dFR[gender][0]=Female&dFR[languages][0]=Hindi&dFR[practic
                     eLocationAddressLocalityRegions][0]=Weston%2C%20FL",
                     "_ccf":{
                        "path":"/staff",
                        "origin":"https://my.clevelandclinic.org"
                     },
                     "name":"Find a Doctor | Cleveland Clinic",
                     "server":"my.clevelandclinic.org",
                     "siteSection":"/staff"
                  },
                  "webReferrer":{
                     "URL":"https://my.clevelandclinic.org/"
                  },
```

70.  **Appointment Scheduling:** As highlighted in the example image below, doctor's pages on the Cleveland Clinic Website feature a button allowing users to "Schedule an Appointment" with that specific doctor:



71.  As shown in the image below, when users click this "Schedule an Appointment" button, the doctor's name and the user's action (i.e., the fact they have made a button click on "Schedule an Appointment") are together automatically intercepted and transmitted to Adobe by the Adobe Tracker. This transmission includes the Kndctr Cookie containing the ECID, linking these sensitive medical interests to the individual user's digital profile.

27



72.   **Phone Contact Attempts:** Doctors' profile pages display doctors' phone numbers, allowing users to initiate contact. As highlighted in the image below, when a user clicks on the doctor's phone number, the Adobe Tracker intercepts this interaction, transmitting both the doctor's identity and the user's

intent to make phone contact to Adobe. This transmission includes the Kndctr Cookie containing the ECID, creating a record of the user's attempt to contact a specific healthcare provider, and linking these sensitive medical interests to the individual user's digital profile

73.    **Patient Portal entries:** The Website enables users to login or signup to "MyChart", which is described as "a secure, online health management tool that connects Cleveland Clinic patients to portions of their electronic medical record allowing you to see test results, message your physician, schedule appointments and more." However, as highlighted in the image below, when Website users click to "Sign Up or Login" to their MyChart patient portal, the Adobe Tracker automatically intercepts this action and transmits to Adobe the fact that clicked the "Sign Up" or "Login" button. This transmission includes the Kndctr Cookie containing the ECID, creating a record of the user's attempt to contact a specific

```
406    https://edge.adobedc.net      POST      /ee/v1/interact?configId=d587108c-...  ✓      200      1236    JSO

Request    Response                                                                                    ⏸ ≡ ▢

Pretty   Raw   Hex                                                                                    ⌀ ≋ \n ≡

          "xdm":{
              "eventType":"web.webinteraction.linkClicks",
              "web":{
                  "webPageDetails":{
                      "URL":"https://my.clevelandclinic.org/florida/staff/31900-manisha-chand",
                      "_ccf":{
                          "path":"/florida/staff/31900-manisha-chand",
                          "origin":"https://my.clevelandclinic.org"
                      },
                      "name":"Manisha Chand, MD | Cleveland Clinic",
                      "server":"my.clevelandclinic.org",
                      "siteSection":"/florida/staff/31900-manisha-chand"
                  },
                  "webReferrer":{
                      "URL":
                      "https://my.clevelandclinic.org/florida/staff?q=diabetes&dFR[languages][0]=Hindi&dFR[practiceLocationAddress
                      LocalityRegions][0]=Weston%2C%20FL&dFR[searchCollections][0]=13"
                  },
                  "webInteraction":{
                      "URL":"tel:8774632010",
                      "name":"877.463.2010",
                      "type":"other",
                      "region":""
```

healthcare provider and indicating their status as a patient at Cleveland Clinic, and

linking these sensitive medical interests to the individual user's digital profile



74. **Location and Service Searches:** The Website's "Find a Location" feature allows users to search for medical facilities by filtering based on location type, specialty, and service type. The image below shows example searches for different medical services. The Adobe Tracker automatically intercepts the filtering criteria that users enter for these searches and transmits them to Adobe. Each transmission includes the Kndctr Cookie containing the ECID, linking these sensitive medical interests to an individual user's digital profile. The image below shows information transmitted to Adobe when a user searches for "Brain Tumor" under the "Specialities" filter.



75.     **Health Library Searches:** The Website's Health Library allows users to search for and read about health conditions. When users search for health conditions and click on results pages, Adobe intercepts both the search query and the specific pages visited. This transmission includes the Kndctr Cookie containing the ECID, linking these sensitive medical interests to an individual user's digital profile. The image below shows information transmitted to Adobe that occurs when a user visits the page for "hemorrhoids" in the Health Library.



76. **General Website Search:** The Website includes a general search bar where users can enter any health-related query. Any information entered into the Website's general search bar is intercepted by the Adobe Tracker and transmitted to Adobe. This includes searches for specific conditions, treatments, or symptoms, with all transmissions including the Kndctr Cookie containing the ECID, linking these sensitive medical interests to an individual user's digital profile. The image below shows information transmitted to Adobe when a user searches for "schizophrenia" using the search bar:



77.    The above transmissions, each of which are combined with the Kndctr Cookie containing the ECID, allow Adobe to identify the person who has submitted this information through the Website and build comprehensive profiles of individual users' health concerns.

78.    Upon information and belief, based on the technical implementation of these trackers and their documented capabilities, the Google DoubleClick, Amazon, Magnite, Casale Media, and OpenX trackers are intercepting similar categories of health information alongside personally identifiable cookies as demonstrated with

the Adobe Tracker. Further discovery will reveal the full extent of each tracker's interception activities.

v.    *Defendant's Responsibility for the Interception of Electronic Communications*

79.    Although the Trackers perform the technical functions of intercepting electronic communications, Cleveland Clinic bears full legal responsibility for these actions as the entity that has procured Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX to intercept these communications.

80.    Cleveland Clinic made the affirmative decision to implement the Trackers on its Website. This implementation was a deliberate action requiring Cleveland Clinic's web administrators to copy the Trackers' tracking codes and insert it into the Website's source code. Without Cleveland Clinic's deliberate implementation of this code, Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX would have no access to the electronic communications of Defendant's Website's visitors.

81.    Cleveland Clinic controls which pages of its Website contain the tracking codes and could choose to exclude tracking from sensitive pages where healthcare information is accessed or inputted, yet it has chosen to implement tracking across these sensitive areas of its Website. Cleveland Clinic maintains

complete control over its Website and has the ability to remove or modify the Trackers at any time. Its continued use of this Trackers represents an ongoing choice to procure Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX to intercept electronic communications from visitors to the Website.

82.     Cleveland Clinic has procured Adobe's, Google's, Amazon's, Magnite's, Index Exchange's, and OpenX's services to intercept electronic communications from its Website visitors and has arranged, aided, and abetted the interception of these communications by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX, where the data is then stored, analyzed, and potentially combined with other data in these corporations' possession.

83.     Cleveland Clinic receives direct benefits from implementing this Trackers, including detailed analytics about Website usage that inform its business and marketing decisions. These benefits further establish Cleveland Clinic's responsibility for procuring the interception practices that generate these analytics.

84.     These arrangements constitute a procurement of another person to intercept electronic communications without the consent of all parties to the communication, in direct violation of Chapter 934.03 of the FSCA, which prohibits such interception "without the consent of all parties to the communication."

*vi.*    *Defendant's Failure to Obtain Consent for the Interception*

85.    Cleveland Clinic fails to obtain consent from Website users before procuring the interception of their electronic communications by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX.

86. Cleveland Clinic's Privacy Policy is presented as a link buried in small text at the bottom of webpages on the Website, among numerous other links, providing no reasonable notice to users.

87.    In any case, the Privacy Policy falsely claims that "[n]o information provided by patients during medical consultations or requests for medical appointments is ever used for marketing purposes." However, as demonstrated above, Cleveland Clinic systematically shares information provided by users during requests for medical appointments with third parties that may use it for advertising and marketing.

88.    The Privacy Policy further references a "HIPAA Notice" that purportedly governs the use of Protected Health Information, but this HIPAA Notice is not accessible anywhere on the Website, leaving users without crucial information about their privacy rights.

89.    A further document referred to in the Privacy Policy, Cleveland Clinic's Notice of Privacy Practices, states: "[W]e will use your health information and disclose it outside Cleveland Clinic for treatment, payment, health care

operations, and when required or permitted by law. We will not use or disclose your health information for other reasons without your written authorization." This representation is untrue, as Cleveland Clinic shares users' medical information for purposes related to Website analytics and advertising without their knowledge or consent.

90.     Even if the Privacy Policy did accurately describe the nature and extent of interceptions and transmissions to third parties occurring on the Website (which it does not), providing a link to a Privacy Policy without requesting consent does not constitute obtaining consent of all parties to the communication.

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

91.     Cleveland Clinic's procurement of unauthorized interception of Website user communications has caused actual harm to Plaintiffs and Class members in multiple ways.

92.     *Invasion of Privacy:* Medical and health-related information about individuals is highly private, and its interception can result in significant embarrassment, stigma, and even discrimination. Plaintiffs and Class members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and healthcare-related activities. These communications included searches for medical specialists, searches for treatments, and inquiries

about medical conditions. The interception of these communications violated Plaintiffs' and Class members' reasonable expectation that their interactions with a healthcare provider would remain private.

93.     *Loss of Data Value*: Plaintiffs and Class members have been deprived of the economic value of their personal data. In today's digital economy, personal data, especially health-related information, has significant commercial value.

94.     In a 2014 article by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium.[3] The Commission subsequently brought a lawsuit against one of the data brokers for selling location data regarding people who visit abortion clinics for approximately $160 for a week's worth of data.[4]

95.     For years, data harvesting has been one of the fastest growing industries in the United States. Conservative estimates suggest that internet companies earn hundreds of dollars per American user through the interception and use of personal data.

---

[3] Data Brokers, A Call For Transparency And Accountability, Federal Trade Commission, (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf
[4] *See* https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other

96.     The value of health data is well-known and has been reported on extensively in the news. For example, a 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" described the extensive market for health data and noted that the market for information was both lucrative and a significant risk to privacy.[5]

97.     Due to the difficulty in obtaining health information, illegal markets also exist for such personal and sensitive information.  NPR reported that health data can be "more expensive than stolen credit card numbers."[6]

98.     Plaintiffs' and Class members' private and personal data, including their protected health information, have a recognized monetary value. Cleveland Clinic's procurement of unauthorized interception by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX of this sensitive personal data has deprived Plaintiffs and Class members of the economic value of their personal property without proper consideration and has resulted in Cleveland Clinic unjustly enriching itself at the expense of Plaintiffs and Class members.

99.     *Chilling Effect on Healthcare Communication:* Cleveland Clinic's conduct has undermined patient trust and created a chilling effect on digital

---

[5] *See* https://time.com/4588104/medical-data-industry/ (last visited May 22, 2025).
[6] Aarti Shahani, *The Black Market For Stolen Health Care Data*, NPR (Feb. 13, 2015, 4:55 am), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-forstolen-health-care-data (last visited May 22, 2025).

healthcare communications. Plaintiffs and Class members can no longer confidently use the Website to seek medical information, locate healthcare providers, research treatments, or manage their healthcare without fear that their activities are being intercepted by third parties. This chilling effect may lead to reluctance to seek needed healthcare information or services online, potentially impacting health outcomes.

100.   *Risk of Further Use of Intercepted Data:* Once intercepted by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX, Plaintiffs' and Class members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm. For example, Google may combine the health-related data it intercepts from Cleveland Clinic's Website with data from its other services (such as Google Search, YouTube, or Gmail) to create detailed user profiles that include sensitive health information.

101.   *Statutory Injury:* Independent of the above harms, Cleveland Clinic's violation of the ECPA and the FSCA has caused Plaintiffs and Class members to suffer statutory injury, entitling them to statutory damages provided by law.

**PLAINTIFFS' EXPERIENCES**

102. Plaintiff Anna Weatherly is a patient of Cleveland Clinic in Florida. On several occasions in 2025, Plaintiff accessed the Website using the Edge web browser to search for physicians, schedule an appointments, and to access the Cleveland Clinic patient portal.

103. At all relevant times, Plaintiff Anna Weatherly was unaware that her personal health information and data was being shared with third parties.

104. Plaintiff Pamela Charney is a patient of Cleveland Clinic in Florida. On several occasions in 2024 and 2025, Plaintiff accessed the Website using the Chrome browser to search for doctors; search for treatments, symptoms, and conditions; schedule appointments; and to access the patient portal.

105. At all relevant times, Plaintiff Pamela Charney was unaware that her personal health information and data was being shared with third parties.

## CLASS ACTION ALLEGATIONS

106. Plaintiffs bring this action on behalf of themselves individually and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

107. Plaintiffs seeks to represent the following nationwide class:

**Nationwide Class**: All individuals in the United States whose electronic communications were intercepted through Cleveland Clinic's Website by

third parties during the applicable statute of limitations period ("Nationwide Class").

108.   Plaintiffs also seeks to represent the following state subclass:

**Subclass**: All individuals in Florida whose electronic communications were intercepted through Cleveland Clinic's Website by third parties during the applicable statute of limitations period ("Subclass").

109.   Unless the context requires otherwise, the Nationwide Class and Florida Subclass are collectively referred to as the "Class."

110.   Excluded from the Class are: (a) Defendants and their officers, directors, employees, subsidiaries, and affiliates; (b) the Judge presiding over this action and any member of the Judge's immediate family and staff; (c) any juror assigned to this case; and (d) governmental entities.

111.   Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

112.   *Numerosity*: The Classes are so numerous that joinder of all members is impracticable. Cleveland Clinic operates 319 locations worldwide, including fifty facilities in Florida. The Website receives millions of visitors annually, many of whom had their communications intercepted during the relevant period. The Class size is estimated to be in the tens or hundreds of thousands.

113.    *Commonality and Predominance*: There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a)    Whether Cleveland Clinic implemented the Trackers on its Website;

(b)    Whether the Trackers intercepted Website users' electronic communications;

(c)    Whether Cleveland Clinic procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d)    Whether Website users consented to the interception of their electronic communications;

(e)    Whether Cleveland Clinic's conduct violated Chapter 934.03 of the FSCA;

(f)    Whether Defendants' conduct violated 18 U.S.C. § 2511 of the ECPA;

(g)   Whether Cleveland Clinic's procurement of interception of Website users' electronic communications constitutes an invasion of privacy;

(h)   Whether Cleveland Clinic has been unjustly enriched through its conduct;

(i)   Whether Plaintiffs and Class members are entitled to damages and other monetary relief, and if so, in what amount;

(j)   Whether Plaintiffs and Class members are entitled to equitable relief, including but not limited to injunctive relief.

114.   *Typicality*: Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and Class members all visited the Website and had their electronic communications intercepted without their consent. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members and are based on the same legal theories.

115.   *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

116. *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for numerous reasons. The damages suffered by many Class members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Cleveland Clinic. In contrast, a class action will present far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

117. *Injunctive Relief Appropriate*: Cleveland Clinic has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class.

## CAUSES OF ACTION

### COUNT I:

### Violations of the Electronic Communications Privacy Act (18 U.S.C. § 2511)
### (On behalf of the Nationwide Class)

Plaintiffs incorporate the above paragraphs by reference and further says—

118.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of electronic communications, and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

119.    The ECPA protects both the sending and receipt of communications and provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

120.    The transmissions between Plaintiffs and Nationwide Class members and Cleveland Clinic's Website are "transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and therefore constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

121.    The ECPA defines "content" to "include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The health information intercepted here, including physician searches, medical conditions, appointment requests, and treatment inquiries, constitutes content under the ECPA.

122.    The Trackers implemented by Cleveland Clinic constitute "electronic, mechanical, or other devices" within the meaning of 18 U.S.C. § 2510(5) because

they are specifically designed to intercept and acquire the contents of electronic communications between Website visitors and Cleveland Clinic.

123.  The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). As described above, the Trackers are embedded software that acquire the contents of users' communications as they are inputted by users into Defendant's Website, in real-time and contemporaneously with their transmission.

124.  By deliberately implementing the tracking codes of Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX on its Website, Cleveland Clinic procured these third parties to intercept its visitors' electronic communications. Specifically: (a) Cleveland Clinic made the affirmative decision to embed each Tracker's code into its Website; (b) Cleveland Clinic's implementation of these codes was the necessary predicate act that enabled the third parties to intercept users' communications; without Cleveland Clinic's actions, these third parties would have no access to the communications; (c) Cleveland Clinic controls which pages contain the tracking codes and could have excluded them from sensitive areas where health information is transmitted, but chose not to; (d) Cleveland Clinic maintains ongoing relationships with these third parties and continues to facilitate their interception of user communications; (e) Cleveland Clinic receives benefits

48

from this arrangement, including analytics data and advertising capabilities, creating a quid pro quo relationship.

125.   Through this procurement, Cleveland Clinic caused Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX to intercept, in real-time, the electronic communications of users containing sensitive health information, in violation of 18 U.S.C. § 2511(1)(a).

126.   By intentionally using or endeavoring to use the contents of these intercepted communications, knowing or having reason to know the information was obtained through illegal interception, Defendant violated 18 U.S.C. § 2511(1)(d).

127.   Plaintiffs and Nationwide Class members had a reasonable expectation that their communications with a healthcare provider's website would remain confidential and would not be intercepted by third parties that Cleveland Clinic had procured for commercial purposes.

128.   Users did not consent to Cleveland Clinic's procurement of third-party interception and sharing of their health information for advertising and analytics purposes.

129.   Cleveland Clinic was not acting under color of law when procuring these interceptions, and no other exception to ECPA liability applies.

130.   As a direct result of Cleveland Clinic's violations, Plaintiffs and Nationwide Class members are entitled to: (a) actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

## COUNT II:
### Violations of the Florida Security of Communications Act (Fla. Stat. § 934.03)
### (Florida Subclass)

Plaintiffs incorporate the above paragraphs by reference and further says—

131.   The FSCA, § 934.03, prohibits the intentional interception, endeavors to intercept, or procurement of any person to intercept or endeavor to intercept any wire, oral, or electronic communication without the consent of all parties to the communication.

132.   The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." § 934.02(12).

133.   The FSCA further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." § 934.02(3).

134.   The FSCA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, electronic, or oral communication" other than equipment furnished to the subscriber or user by a provider in the ordinary course of its business. § 934.02(4).

135.   The Trackers implemented by Cleveland Clinic in its Website source code constitute an "electronic, mechanical, or other device" under the FSCA because (a) Each is a JavaScript code specifically designed to intercept and acquire the contents of electronic communications between Website visitors and Cleveland Clinic; (b) Each captures the content and substance of these communications in real-time, contemporaneously with their transmission; (c) Each functions to acquire data about user interactions, including sensitive health information, searches for medical specialists, treatment inquiries, and other protected healthcare communications; and (d) They were not furnished to Website visitors by a provider of wire or electronic communication service in the ordinary course of its business, nor are they equipment being used by Cleveland Clinic in the ordinary course of its business as a healthcare provider.

136.   The internet communications between Plaintiff, Florida Subclass members, and Cleveland Clinic's Website constitute "electronic communications" as defined by the FSCA, as they are transfers of signs, signals, writing, images,

sounds, data, or intelligence transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system.

137.   Plaintiffs and other Florida Subclass Members had a reasonable expectation of privacy in the electronic communications they had with the Cleveland Clinic's Website. But their electronic communications were transmitted to and intercepted by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX during the communication and without knowledge, authorization, or consent of Plaintiffs and Florida Subclass Members. This occurred because Defendants intentionally inserted electronic devices into its Website that, without the knowledge and consent of Plaintiffs and Florida Subclass members, recorded and transmitted the substance of their confidential communications to unauthorized parties.

138.   Cleveland Clinic, through its implementation of the Trackers on its Website, has intentionally procured, aided and abetted, and conspired with Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX to intercept the electronic communications of Plaintiffs and Florida Subclass members as they browse the Website.

139.   The interception of these communications occurs in real time, contemporaneously with their transmission. When Plaintiffs and Florida Subclass members interact with the Website, the Trackers immediately intercept these

electronic communications and transmit them to Adobe's, Google's, Amazon's, Magnite's, Index Exchange's, and OpenX's  servers in real-time.

140.   The interception of these communications was done without the consent of Plaintiffs and Florida Subclass members. Cleveland Clinic did not obtain consent from Website users before implementing the Trackers that would intercept their communications.

141.   As a direct result of Cleveland Clinic's violations, Plaintiffs and Florida Subclass members are entitled to recover damages of $1,000 or $100 for each day of violation, whichever is higher, together with reasonable attorneys' fees and costs, as provided by Chapter 934.10 of the FSCA.

142.   Plaintiffs and Florida Subclass members are also entitled to injunctive relief to prevent Cleveland Clinic from continuing to implement Trackers that intercept their electronic communications without proper consent.

## COUNT III:
### Invasion of Privacy — Intrusion upon Seclusion
### (On behalf of Nationwide Class)

Plaintiffs incorporate the above paragraphs by reference and further says—

143.   The common law tort of invasion of privacy, including the form known as intrusion upon seclusion, protects against intrusion upon the Plaintiffs' seclusion or solitude, or into his or her private affairs.

144.   Plaintiffs had a reasonable expectation of privacy in their communications with Cleveland Clinic regarding their healthcare needs, medical conditions, and treatment preferences.

145.   Cleveland Clinic intentionally intruded upon the seclusion and private affairs of Plaintiffs by implementing the Trackers on its Website that procured the interception of sensitive, personal health information without proper authorization or consent.

146.   Cleveland Clinic intentionally intruded upon Plaintiffs' seclusion by implementing the Trackers on its Website, enabling the interception of their private communications by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX without their knowledge or consent.

147.   Cleveland Clinic's intrusion upon Plaintiffs' private communications would be highly offensive to a reasonable person. Internet users have a reasonable expectation that their personally identifiable communications with healthcare providers' websites will remain private, particularly when those communications involve sensitive health-related matters such as cancer treatment, reproductive health, and other medical conditions.

148.   Cleveland Clinic's intrusion was intentional, as it deliberately implemented the Trackers on its Website to capture user communications for its own business purposes.

54

149.   As a direct and proximate result of Cleveland Clinic's invasion of their privacy, Plaintiffs have suffered injury, including loss of their reasonable expectation of privacy and diminution in the value of their personal information.

150.   Plaintiffs are entitled to damages, including compensatory and punitive damages, in an amount to be determined at trial.

## COUNT IV:
## Unjust Enrichment
## (On behalf of Nationwide Class)

Plaintiffs incorporate the above paragraphs by reference and further says—

151.   Cleveland Clinic has received a benefit from Plaintiffs through the interception of their valuable personal data via the Trackers.

152.   By implementing the Trackers on its Website, Cleveland Clinic has been able to procure the interception of users' electronic communications by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX for business purposes, including marketing and advertising, thereby enriching itself at the expense of Plaintiffs.

153.   Cleveland Clinic has retained this benefit under circumstances which make it inequitable to do so without payment of its value to Plaintiffs.

154.   Plaintiffs have suffered a corresponding detriment, including the loss of the economic value of their personal data and the invasion of their privacy.

155.   It would be unjust and inequitable to allow Cleveland Clinic to retain the benefits of its unlawful conduct.

156.   Plaintiffs are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Cleveland Clinic through its wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully requests that this Court:

(a)   Certify this case as a class action on behalf of the Class, appoint Plaintiffs as Class representatives, and appoint Plaintiffs' counsel as Class counsel;

(b)   Declare that Cleveland Clinic's actions, as described herein, violate ECPA, the FSCA, and constitute invasion of privacy and unjust enrichment;

(c)   Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(d)   Award Plaintiffs and the Nationwide Class statutory damages of $10,000 or $100 per day for each violation, whichever is greater,

as provided by 18 U.S.C. § 2520(c)(2)(B) of the Electronic Communications Privacy Act;

(e)  Award Plaintiffs and the Florida Subclass statutory damages of: $1,000 or $100 for each day of violation, whichever is higher, as provided by Chapter 934.10 of the Florida Security of Communications Act;

(f)  Award Plaintiffs and the Class punitive damages;

(g)  Award Plaintiffs and the Florida Subclass restitution and disgorgement of all profits, benefits, and other compensation obtained by Cleveland Clinic from its wrongful conduct;

(h)  Award injunctive relief requiring Cleveland Clinic to cease procuring the interception of Website users' communications without proper consent; destroy all user data intercepted through the Trackers; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

(i)  Award pre-judgment and post-judgment interest;

(j)  Award reasonable attorneys' fees and costs, as allowed by law; and

(k)   Grant such other and further relief as the Court deems just and

proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: December 8, 2025                    **PARAFINCZUK WOLF, P.A.**

Respectfully submitted,

By: */s/Justin Parafinczuk, Esq.*
     Justin Parafinczuk, Esq.
     Jason B. Wolf, Esq.
     Rachel Cowen Lucuara, Esq.
     Steven D. Resnick, Esq. (*pro hac vice pending*)
     5550 Glades Road, Suite 500
     Boca Raton, FL 33431
     Tel. (954) 462-6700
     Fax (954) 462-6567
     Emails: pleadings@parawolf.com
     clevelandclinic@parawolf.com
     jparafinczuk@parawolf.com
     jwolf@parawolf.com
     rlucuara@parawolf.com
     sresnick@parawolf.com

     *Attorneys for Plaintiffs*