**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**CASE NO.: 25-cv-62530-CIV-AHS**

**ANNA WEATHERLY,** and
**PAMELA CHARNEY,** on
behalf of themselves and all
others similarly situated,

Plaintiffs,

v.

**THE CLEVELAND CLINIC FOUNDATION,**
and **CLEVELAND CLINIC FLORIDA**
**HEALTH SYSTEM NONPROFIT**
**CORPORATION,**

Defendants.

_____________________________________________/

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND INCORPORATED MEMORANDUM OF LAW**

Defendants, The Cleveland Clinic Foundation and Cleveland Clinic Florida Health System Nonprofit Corporation (collectively, "Cleveland Clinic"), pursuant to Federal Rule of Civil Procedure 12(c), move for judgment on the pleadings as to each claim in Plaintiffs Anna Weatherly and Pamela Charney's (collectively, "Plaintiffs") Complaint [ECF No. 1] and state:

## I. <u>INTRODUCTION & BACKGROUND</u>

In their Complaint, Plaintiffs rely on sweeping generalizations and random, cherry-picked facts to support the assertion that Cleveland Clinic improperly used common, business tools on its Website in a way that violates both the federal and Florida wiretap statutes—the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq*. ("ECPA"), and the Florida Security of Communications Act, Fla. Stat. § 934.03 ("FSCA"), respectively—as well as common law protections against invasion of privacy and unjust enrichment. The crux of Plaintiffs' Complaint is that Cleveland Clinic allegedly used tools created by Adobe, Google, Amazon, Magnite, Index Exchange, and OpenX on specific webpages on Cleveland Clinic's Website—"Find a Doctor" (i.e., Find a Provider[1]), Appointment Scheduling, MyChart, Find a Location, Website Search and Health Library (collectively, the "Relevant Webpages")—and that these tools intercepted Plaintiffs' "communications" with Cleveland Clinic, invaded Plaintiffs' privacy, and somehow conferred unjust benefits on Cleveland Clinic. Compl. ¶¶ 118–156. Plaintiffs' ultimate conclusions—that Cleveland Clinic violated state or federal wiretap laws, invaded Plaintiffs' privacy, and was unjustly enriched—are wrong. As is clear in Cleveland Clinic's Answer, Plaintiffs are factually right in two respects, but neither establishes a plausible claim for relief.

---

[1] Cleveland Clinic admits in part that a "Find a Doctor" webpage, as described and defined in the Complaint, is available on the Website. However, the currently operative webpage with the same functionality as "Find a Doctor" is the Find a Provider webpage available at https://my.clevelandclinic.org/providers (last visited Mar. 16, 2026). *See* Answ. & Aff. Defs., [ECF No. 20] ¶ 1, n.1.

First, although Plaintiffs never allege which Adobe product within Adobe's suite of software products[2] Cleveland Clinic actually uses, Cleveland Clinic admits it licenses Adobe Analytics and deploys that tool on the Relevant Webpages. *See* Answ. & Aff. Defs., [ECF No. 20] ¶ 1. Cleveland Clinic's contract with Adobe to license Adobe Analytics includes a Business Associate Agreement ("BAA") under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and a Data Processing Addendum ("DPA"), which on its face prohibits the combination, sale, or sharing of personal data. *Id*. ¶¶ 1, 3, and Exs. A–B.[3] Adobe's technology, subject to such limitations, effectively becomes an extension of Cleveland Clinic.

Second, although Plaintiffs do not specify which of the Relevant Webpages purportedly contain tools other than Adobe, Cleveland Clinic admits certain third-party tools from Google, Amazon, and others (collectively, "Programmatic Advertising Tools"), are present on select public-facing and unauthenticated (i.e., no login required) webpages on the Website, including its Health Library page.[4] *Id*. ¶ 1. It is beyond dispute that the Health Library page is publicly available and requires no log-in, thus allowing any and all website users to obtain general information

[2] Adobe's public facing website confirms it offers multiple tools to its business customers, some of which involve advertising services and others of which do not. *See* ADOBE, *Adobe Business Products*, available at: https://business.adobe.com/products.html (last visited Mar. 16, 2026). Courts can take judicial notice of information on public facing websites. *See, e.g., Coleman v. Burger King Corp.,* No. 22-cv-20925, 2025 WL 328090, at *15 n. 9 (S.D. Fla. Nov. 25, 2025) (taking judicial notice of a publicly facing website); *see also Cunningham v. Dist. Attorney's Off. for Escambia Cnty*., 592 F.3d 1237, 1255 (11th Cir. 2010) (courts may take judicial notice in the context of a motion for judgment on the pleadings).

[3] The DPA between Adobe and Cleveland Clinic is identical to the publicly available version. *See* ADOBE, *DPA*, available at: https://www.adobe.com/cc-shared/assets/pdf/legal/terms/enterprise/pdfs/dpa-ww.pdf (last visited Mar. 16, 2026). This Court can take judicial notice of publicly available documents, including template agreements. *See, e.g., Fla. Immigrant Coal. v. Uthmeier*, 787 F. Supp. 3d 1323, 1332 (S.D. Fla. 2025) (collecting cases nationwide of publicly accessible website content).

[4] *See* CLEVELAND CLINIC, *Health Library*, available at: https://my.clevelandclinic.org/health (last visited Mar. 16, 2026).

regarding health conditions. No information shared with Cleveland Clinic via the Health Library page is treated as protected health information under HIPAA. *See id.* ¶ 3.

Cleveland Clinic's admissions combined with the dearth of plausibly alleged facts in the Complaint, collectively preclude this Court from drawing the necessary inferences to sustain Plaintiffs' claims. Against this factual and procedural backdrop, entry of judgment on the pleadings in Cleveland Clinic's favor is warranted for the following reasons:

- Plaintiffs do not and cannot plausibly allege that any of ***their*** communications were intentionally intercepted through the use of Cleveland Clinic's Website.
- Due to the Adobe DPA and BAA and the lack of PHI on the Health Library Page, Plaintiffs do not and cannot establish that Cleveland Clinic had a tortious or criminal purpose in using Adobe or the Programmatic Tools and as such Plaintiffs' ECPA claim fails.
- Similarly, due to Cleveland Clinic's BAA and DPA with Adobe, Plaintiffs cannot establish that Adobe intercepted communications on the Relevant Webpages in violation of either the ECPA or the FSCA.
- Plaintiffs' FSCA claim fails because it contradicts recent Florida laws on website tracking technologies.
- Plaintiffs' invasion of privacy claim fails as a matter of law because Plaintiffs do not and cannot allege an intrusion into a private quarter or place and because they cannot allege an intrusion that is highly offensive.
- Plaintiffs' unjust enrichment claim fails as a matter of law because Plaintiffs cannot plausibly allege any benefit conferred and because Plaintiffs cannot allege economic damages that are quantifiable and measurable.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is appropriate when "the complaint lacks sufficient factual matter to state a facially plausible claim for relief that allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct." *Jiles v. United Parcel Serv., Inc.*, 413 F. App'x 173, 174 (11th Cir. 2011) (citations omitted). Accordingly, "[a] motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss." *Grandis v. BGIS*

*Glob. Integrated Sols. US LLC*, No. 22-61477-CIV, 2023 WL 9117335, at *2 (S.D. Fla. Dec. 20, 2023) (Singhal, J.) (citations omitted). Thus, Plaintiffs have an "obligation to provide the grounds for [their] entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The allegations must raise a right to relief above the speculative level. *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Instead, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id*. "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III. ARGUMENT

### A. Plaintiffs' ECPA (Count I) and FSCA (Count II) Claims Fail.

#### 1. Plaintiffs fail to sufficiently allege a violation of the ECPA or the FSCA.

The ECPA prohibits intentional interception and disclosure of "wire, oral, and electronic communications." 18 U.S.C. § 2511. To state a claim under the ECPA, the plaintiff must sufficiently allege that the defendant "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device." *Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307, 1314 (S.D. Fla. 2018). Similarly, the FSCA prohibits intentional "intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication." Fla. Stat. § 934.03. To state a claim under the FSCA, the plaintiff must sufficiently allege that there was an (1) an interception (2) of the contents of a wire, oral or electronic communication (3) through the use of an electronic, mechanical, or other device. *Id*.

Here, Plaintiffs fail to plausibly allege all essential elements because the Complaint relies on generalizations, assumptions, and hypotheticals, not facts. Plaintiffs never allege what PHI or other personal information they purportedly provided to Cleveland Clinic, what webpages they visited or when, or critically that their PHI or other personal information was actually disclosed to third parties by Cleveland Clinic. Courts are in agreement that these are basic and essential facts that must be alleged to support any wiretap claim.

For example, in *Smart v. Main Line Health*, No. 2:22-cv-05239, 2024 WL 2943760 (E.D. Pa. June 10, 2024), the court dismissed an ECPA claim brought by a plaintiff who alleged he had used defendant's website to request "information about specific health conditions, treatments and services." 2024 WL 2943760 at *3. The court found these allegations failed to describe the specific health information allegedly intercepted. *Id.*

> This Court cannot conclude from these general averments what information Plaintiff actually communicated with Main Line Health via his web browsing and when exactly such information was communicated. For example, Plaintiff has not alleged which specific web pages he clicked on for his medical condition or his history of treatment with Main Line Health. And although the Amended Complaint provides an example of a search by a *hypothetical visitor* to the Main Line Health webpage… Plaintiff fails to state what specific HIPPA-protected information Plaintiff *himself* provided to Defendant via his browsing activity that was subsequently disclosed to Meta.

*Id.* at *3 (emph. original); *see also Nienaber v. Overlake Hosp. Med. Ctr.*, No. 2:23-cv-01159-TL, 2024 WL 2133709, at *5 (W.D. Wash. May 13, 2024) (dismissing ECPA claim where allegations that plaintiff used defendant's public website to schedule appointments, communicate with doctors, complete medical forms, and review medical records were insufficient to plead defendant had disclosed her PII and PHI); *Santoro v. Tower Health*, No. 22-cv-04580, 2024 WL 1773371, at *3–5 (E.D. Pa. Apr. 24, 2024) (dismissing ECPA claim where complaint lacked specific examples of what health information from plaintiffs was allegedly transferred to third-party); *Kurowski v.*

*Rush Sys. for Health*, 659 F. Supp. 3d 931, 938 (N.D. Ill. 2023) (dismissing ECPA claim based on "hypothetical data disclosures" that failed to demonstrate health information was disclosed to third parties in violation of HIPAA); *Doe v. Davita, Inc.* ("*Davita*"), No. 23-CV-01424-AJB-BLM, 2024 WL 1772854, at *2 (S.D. Cal. Apr. 24, 2024) (dismissing claim under California's wiretap statute because the complaint was devoid of any facts" supporting the contention that the plaintiff's health information was disclosed).

Here, Plaintiffs' allegations consist of the same conclusory allegations that *Smart* and courts nationwide have rejected. Nothing in the Complaint suggests which pages ***Plaintiffs*** visited, or the specific health information ***Plaintiffs*** supposedly provided to Cleveland Clinic that was disclosed to third parties. Rather, everything is about a hypothetical visitor. *See, e.g.*, Compl. ¶¶ 68–77. In relying purely on hypotheticals, Plaintiffs fail to allege that any of ***their*** information was transmitted to a third-party. This absence of individualized factual allegations, particularly when combined with Cleveland Clinic's Answer, is fatal to Plaintiffs' ECPA and FSCA claims.

**2. Plaintiffs' ECPA claim fails because Plaintiffs do not and cannot allege that Cleveland Clinic had a tortious or criminal purpose.**

The ECPA is a one-party consent statute. *See Pyankovska v. Abid*, 65 F.4th 1067, 1074 (9th Cir. 2023); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 136 (3d Cir. 2015). Section 2511(2)(d) of the ECPA provides an exception when the person intercepting a communication "is a party to the communication or where one of the parties to the communication has given prior consent to such interception." Here, it is indisputable that Cleveland Clinic is a party to communications with visitors on its Website. As such, "[b]ecause [Cleveland Clinic was] the intended recipient[] of the transmissions at issue . . . § 2511(2)(d) means [Cleveland Clinic has] done nothing unlawful under the [Federal] Wiretap Act." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 at 143.

Plaintiffs attempt to plead around the party exception with conclusory and unsupported allegations that Cleveland Clinic violated HIPAA. *See* Compl. ¶¶ 55–56.[5] Plaintiffs appear to be invoking the crime-tort exception. This "exception to the exception" provides that if "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State" then the party exception is inapplicable. 18 U.S.C. § 2511(2)(d). Plaintiffs cannot, as a matter of law, avail themselves of the exception because Cleveland Clinic had no criminal or tortious purpose. Although Plaintiffs conclusorily allege that the "Trackers" as a whole are present on the Website generally, Compl. ¶¶ 61–62, Plaintiffs' own screenshots of each of the Relevant Webpages reveal the truth: only Adobe is present on all Relevant Webpages. *Id.* ¶¶ 68–77. Cleveland Clinic admits Adobe Analytics is present on the Relevant Webpages. Answ. & Aff. Defs. ¶¶ 61–66. Cleveland Clinic also admits the Programmatic Advertising Tools are present on one of the Relevant Webpages: the Health Library. *Id*. Even so, the pleadings do not support an inference that Cleveland Clinic's use of Adobe or the Programmatic Advertising Tools was for a tortious or criminal purpose.

*i. Cleveland Clinic's use of Adobe does not constitute a tortious or criminal purpose.*

Plaintiffs cannot establish that Cleveland Clinic had a criminal or tortious purpose in deploying Adobe Analytics. *See, e.g., Doe v. Kaiser Found. Health Plan, Inc.* ("*Kaiser*"), No. 23-CV-02865-EMC, 2024 WL 1589982, at *10 (N.D. Cal. Apr. 11, 2024) (rejecting argument that use of website supported application of the crime-tort exception because "[v]iolation of HIPAA was not the purpose of the alleged interception").

Cleveland Clinic admits Adobe Analytics is deployed on the Relevant Webpages and did

[5] Other than alleging HIPAA violations, Plaintiffs do not allege any other criminal or tortious purpose.

so pursuant to a software licensing agreement which is subject to Adobe's template DPA ***and*** a BAA under HIPAA. These two documents render implausible Plaintiffs' allegation that Cleveland Clinic disclosed PHI to Adobe for marketing purposes and in violation of HIPAA.

Preliminarily, the DPA expressly prohibits Adobe from commingling, selling or sharing personal data.[6] *See* Answ. & Aff. Defs. at Ex. A. Thus, Plaintiffs' suggestion that Cleveland Clinic deployed Adobe for marketing, Compl. ¶¶ 32–34, is unfounded speculation. *See, e,g., Pina v. FedEx Freight, Inc*., No. 17-cv-24274, 2018 WL 1660671, at *1 (S.D. Fla. Apr. 5, 2018*)* ("[A] plaintiff cannot rely on speculative, vague, or conclusory allegations.") (citations omitted).

Further, where Adobe receives PHI from visitors to the Relevant Webpages, it does so pursuant to a BAA. *See, e.g.,* Answ. & Aff. Defs. ¶ 1, Ex. B. Under HIPAA, a covered entity (i.e., Cleveland Clinic) may disclose PHI to a business associate (i.e., Adobe) and may allow the business associate to create, receive, maintain, or transmit PHI on its behalf, if the covered entity obtains "satisfactory assurances" that the business associate will appropriately safeguard the information. *See* 45 C.F.R. § 164.502(e)(1)(i); § 164.308(b)(1). Those satisfactory assurances are documented via a contractual BAA. *Id.* § 164.308(b)(1).[7]

In other words, as a business associate, Adobe is allowed, as a matter of law, to receive the

---

[6] *See* ADOBE, *DPA*, available at: https://www.adobe.com/cc-shared/assets/pdf/legal/terms/enterprise/pdfs/dpa-ww.pdf (last visited Mar. 16, 2026).

[7] The Department of Health and Human Services ("HHS") has specified that a covered entity is not liable for acts of its business associate when a BAA is in place: "The HIPAA Privacy Rule requires covered entities to enter into written contracts or other arrangements with business associates which protect the privacy of protected health information; ***but covered entities are not required to monitor or oversee the means by which their business associates carry out privacy safeguards or the extent to which the business associate abides by the privacy requirements of the contract***. ***Nor is the covered entity responsible or liable for the actions of its business associates***." HHS, *Answer to FAQ 236*, available at: http://www.hhs.gov/ocr/privacy/hipaa/faq/business_associates/236.html (last visited Mar. 12, 2026) (emphasis added).

very information Plaintiffs implausibly allege was unlawfully intercepted—their PHI—from Cleveland Clinic. Thus, there is no HIPAA violation, nor could there be. Courts have dismissed ECPA claims based on implausible HIPAA violations, even in the absence of a BAA. *See, e.g., Hartley v. Univ. of Chicago Med. Ctr.*, No. 22 C 5891, 2023 WL 7386060, at *2 (N.D. Ill. Nov. 8, 2023) ("[T]here is an absolute dearth of information specific to Plaintiff as what was disclosed to Facebook that would plausibly be in violation of HIPAA."). Here though, the DPA and BAA make further implausible Plaintiffs' conclusory allegation that Adobe used Website visitor data for marketing. Under these circumstances, judgment on the pleadings is more than appropriate.

*ii. Cleveland Clinic's use of the Programmatic Advertising Tools does not constitute a tortious or criminal purpose.*

Plaintiffs also cannot allege any tortious or criminal purpose with respect to the Programmatic Advertising Tools. Again, Plaintiffs' inartful lumping of all "Trackers" into a single, omnipresent unit across the entire Website should be ignored as conclusory speculation in light of (1) Plaintiffs' own screenshots showing only Adobe present on the Relevant Webpages, and (2) Cleveland Clinic's admission that, among the Relevant Webpages, the Programmatic Advertising Tools are only present on the public-facing Health Library. *See* Compl. ¶¶ 68–77; Answ. & Aff. Defs. ¶¶ 1, 61–66. By Plaintiffs' own admissions, the Health Library allows "users to search for and read about health conditions." Compl. ¶ 75. Plaintiffs cannot demonstrate that Cleveland Clinic's use of Programmatic Advertising Tools on this unauthenticated webpage accessible to any internet user violates HIPAA or was done for any other criminal or tortious purpose.

First, the Health Library does not as a matter of law collect or receive PHI such that there could be a plausible HIPAA violation. *See Smith v. Facebook, Inc.* ("*Smith I*"), 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017) (holding that disclosure to Facebook of browsing history on healthcare providers' public websites did not disclose protected health information because

"[t]hese pages contain general health information that is accessible to the public at large."). In fact, the district court in *Smith I*—***a case in which Cleveland Clinic was a named defendant***—held that the type of information allegedly at issue on the Health Library is not "medical information:"[8]

> The URLs at issue…point to pages containing information about treatment options for melanoma, information about a specific doctor, search results related to the phrase 'intestine transplant,' a wife's blog post about her husband's cancer diagnosis, and other publicly available medical information… ***These pages contain general health information that is accessible to the public at large. The same pages are available to every computer, tablet, smartphone, or automated crawler that sends GET requests to these URLs. Nothing about the URLs, or the content of the pages located at those URLs, relates to the past, present, or future physical or mental health or condition of an individual.***

262 F. Supp. 3d at 954–55 (emphasis added). The Ninth Circuit affirmed the district court, similarly stating: "The data show only that Plaintiffs searched and viewed publicly available health information that cannot, in and of itself, reveal details of an individual's health status or medical information." *Smith v. Facebook, Inc.* ("*Smith II*"), 745 F. App'x 8, 9 (9th Cir. 2018); *see also Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780, 794 (N.D. Tex. 2024) ("The mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not sufficient . . . to constitute [individually identifiable health information]."). Like the webpages in *Smith*, the Health Library is a publicly accessible database of general health information that by design and as a matter of law does not collect individually identifiable health information. Thus, any data shared with Programmatic Advertising Tools while Plaintiffs may have browsed the Health Library cannot as a matter of law establish a HIPAA violation. *See, e.g., See Nienaber v.*

[8] The specific data alleged to be collected by Cleveland Clinic in *Smith* was a search for "intestine transplant" on the Website Search page. *See Smith v. Facebook*, *Inc.*, 2016 WL 1042966 (N.D. Cal. Mar. 15, 2016), Compl. ¶ 188 ("Plaintiff Jane Doe II sought information, sent to, and received from ClevelandClinic.org communications relating to intestine transplants: http://my.clevelandclinic.org/search/results?q=intestinetransplant"). The *Smith* Court's logic applies equally to the Health Library and merits the same conclusion here.

*Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1095 (W.D. Wash. 2024) (allegations that plaintiff browsed healthcare defendant's public website were insufficient to plead defendant had disclosed her PHI to Facebook).

Second, Plaintiffs cannot plausibly plead any other criminal or tortious purpose related to the presence of Programmatic Advertising Tools on the Health Library. Courts routinely reject plaintiffs' reliance on website tracking technologies as sufficient basis to invoke the crime-tort exception, even when such technologies are allegedly used for advertising or marketing purposes. *See, e.g., T.D. v. Piedmont Healthcare, Inc.*, No. 1:23-CV-5416-TWT, 2024 WL 5284883, at *3 (N.D. Ga. Dec. 10, 2024), *appeal dismissed*, No. 25-10105-JJ, 2025 WL 1894802 (11th Cir. May 9, 2025) (dismissing ECPA claim because the purpose of healthcare defendant's use of the Meta Pixel was to "drive marketing and revenue rather than act tortiously or criminally") (internal quotations omitted); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022) ("[T]he crime-tort exception to the Wiretap Act is inapplicable where the defendant's primary motivation was to make money, not to injure plaintiffs tortiously."); *Nienaber*, 733 F. Supp. 3d at 1095 (dismissing ECPA claim because the healthcare defendant's use of Facebook and Google trackers was not "a tortious or criminal use of the acquired communications, separate from the recording, interception, or transmission"); *Goulart v. Cape Code Healthcare, Inc.*, No. 25-cv-10445-RGS, 2025 WL 1745732, at *3-4 (D. Mass. June 24, 2024) (finding healthcare defendant's use of website tracking tools for commercial purposes, such as retargeting and enhanced analytics, as insufficient to establish a criminal or tortious purpose, and dismissing ECPA claim).

Plaintiffs cannot plausibly allege any set of facts to support application of the crime-tort exception. Consequently, the Court must enter judgment on Count I in Cleveland Clinic's favor.

**3. Plaintiffs do not and cannot allege that Adobe intercepted communications.**

Both the ECPA and FSCA require "interception" by a third-party eavesdropper; an element which Plaintiffs have not and cannot establish with respect to Cleveland Clinic's use of Adobe—the only technology present in Plaintiffs' screenshots of the Relevant Pages. *See* Compl. ¶¶ 66–77. First, the DPA between Cleveland Clinic and Adobe precludes Adobe from commingling, sharing, or selling personal data. *See* Answ. & Aff. Defs. at Ex. A. In other words, Adobe cannot use data derived from Cleveland Clinic for Adobe's own purposes. Second, any PHI that Cleveland Clinic elects to share with Adobe is subject to a BAA. The BAA simultaneously permits Adobe to lawfully access PHI and other information provided by Cleveland Clinic and requires Adobe to secure and protect such information. Together, the DPA and BAA transform Adobe into an extension of Cleveland Clinic.

In situations like these, courts have found software vendors to be an "extension" of the websites that engage them—and thus not third-party eavesdroppers—where the software vendor, like Adobe here, does not use the data for its own benefit. *See, e.g., Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832 (N.D. Cal., 2021); *see also Kaiser*, 2024 WL 1589982, at *18 ("To the extent [p]laintiffs argue that a third party should *per se* be considered an eavesdropper – i.e., even if hired by a party to the communication to do work solely for the party's benefit and with strict limits on the ability of the third party to use the information for any other purpose – the Court does not agree."). *Noom* is instructive. There the court distinguished a software product provided by FullStory, which allowed website owners to analyze visitor data, from software provided by NaviStone and Facebook, both of which aggregated data for re-sale purposes. *Id.* As a result of FullStory's inability to use data for its own or third parties' benefit, the court found that FullStory was not a third-party eavesdropper and thus FullStory's collection of website visitor data did not amount to an "interception" under the ECPA and California's analogous wiretapping statute. *Id.*

The same must be said of Adobe. The combined effect of the DPA and BAA preclude Adobe from using personal data collected by Cleveland Clinic for the purposes set forth in the Complaint, i.e., for advertising, selling, or otherwise sharing. The only reasonable inference in the face of the BAA and the DPA is that Adobe is not a third-party eavesdropper.[9]

**4. Plaintiffs' FSCA claim fails because it contradicts recent Florida laws on website tracking technologies.**

The FSCA defines the "contents" of a communication to mean "any information concerning the *substance, purport or meaning of the communication*." § 934.02(7), Fla. Stat. (emphasis added). Plaintiffs' theory necessarily rests on the unsupported premise that ***every*** interaction with the Website is an electronic communication where "contents" are wrongfully intercepted by "Trackers." Accepting Plaintiffs' view of the FSCA would effectively result in criminal liability for any website operator who utilizes any tracking technology on its website.

Plaintiffs' view of the FSCA is both impractical at a time when so much business is transacted online, and inconsistent with other Florida law governing online data collection, use and sharing. The State's 2024 enactment of the Florida Digital Bill of Rights ("FDBR") (Fla Stat. §§ 501.701 *et seq.*) highlights why Plaintiff's contortion of the FSCA is inconsistent with current legislative intent. For example, the FDBR expressly permits subject entities to "collect, use, or retain data" to "conduct internal research to develop, improve, or repair products, services, or technology" without restriction. *Id.* § 501.717(1)(a). Under Plaintiff's theory, an entity could fully comply with the FDBR by, for example, collecting website user data directly or through a "processor," for internal analytics purposes, yet still be subject to criminal liability under the FSCA

[9] Based on the information now in the record, amendment would be futile. Plaintiffs cannot allege in good faith that Adobe used information collected by Cleveland Clinic for Adobe's commercial purposes, nor could Plaintiffs allege that Cleveland Clinic violated HIPAA by sharing PHI with Adobe. For this reason, Cleveland Clinic seeks judgment on the pleadings.

because any use of licensed technology to collect such data is an interception of the contents of an electronic communication. Plaintiffs' interpretation of the FSCA is fundamentally at odds with the modern realities of website usage and data collection through website tracking technologies—realities that simply did not exist when the FSCA was enacted decades ago.[10] *See Butler v. State*, 838 So. 2d 554, 556 (Fla. 2003) ("It is presumed that statutes are passed with the knowledge of existing statutes, so courts must favor a construction that gives effect to both statutes rather than construe one statute as being meaningless or repealed by implication.").

### B. Plaintiffs' Invasion of Privacy Claim (Count III) Fails as a Matter of Law.

To state a claim for invasion of privacy based on intrusion upon seclusion, the plaintiff must allege a: (1) physical or electronic intrusion; (2) into a private quarter that is (3) highly offensive to a reasonable person. *Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285 (S.D. Fla. 2020). Count III fails as a matter of law because Plaintiffs do not and cannot allege an intrusion into Plaintiffs' private quarters, let alone one that is highly offensive to a reasonable person.

---

[10] Indeed, the FDBR's legislative history addresses cookies and similar tracking technologies in the context of other regulatory frameworks, including the California Consumer Privacy Act, the EU's General Data Protection Regulation, the Florida Information Protection Act, and HIPAA. *See generally,* Florida Staff Analysis, S.B. 262, 4/25/2023, available at https://www.flsenate.gov/Session/Bill/2023/262/Analyses/2023s00262.rc.PDFwebsite (last visited Mar. 16, 2026). Notably, however, the legislative history of the FDBR makes no reference to the FSCA—signaling no intent to broadly expand wiretapping liability to every use of website tracking technologies. *See Brooks v. State*, 363 So. 3d 181, 185 (Fla. 5th DCA 2023) ("[W]hen a legislative body knows how to say something but chooses not to, its silence is controlling.") (citations and internal quotations omitted). Courts in other jurisdictions have similarly interpreted legislative history in construing their wiretap statutes as inapplicable to the use of website tracking technologies. *See, e.g., Rodriguez v. Ink America Intern. Group LLC*, No. 25STCV15350, 2025 WL 4034985, at *3 (Cal. Super. Dec. 10, 2025) ("If the California Legislature wanted to apply [wiretap statute] to the website tracking tools, it could do so by amending such provision. The Legislature's drafting in related provisions confirms that it knows how to regulate internet-based activity when it wishes to do so."); *Schallert v. Orkin LLC*, No. 24STCV31244, 2025 WL 4332757, at *6 (Cal. Super. Dec. 15, 2025) ("When the Legislature wants to address privacy concerns in connection with web usage, it can do so and has done so expressly. This Court is not persuaded that the Legislature did so in the [wiretap statute] at issue here.").

**1. Plaintiffs fail to allege any intrusion into a private quarter.**

Intrusion upon seclusion "requires intrusions into a 'place' in which there is a reasonable expectation of privacy." *Spilfogel v. Fox Broad. Co.*, 433 F. App'x 724, 726 (11th Cir. 2011) (citing *Allstate Ins. Co. v. Ginsberg,* 863 So. 2d 156, 162 (Fla. 2003) (per curiam)). "For liability to attach, the offender must be guilty of physically or electronically intruding into one's private quarters." *Id.* (holding that filming of the plaintiff on a public street did not establish that the defendants intruded upon seclusion); *see also Hammer v. Sorensen*, 824 F. App'x 689, 695 (11th Cir. 2020) ("[T]he Supreme Court of Florida has construed the tort of intrusion upon seclusion even more narrowly than the Restatement . . . It has required a plaintiff to show an intrusion into a private place and not merely a private activity.") (citation omitted). Indeed, "courts considering this issue have concluded that [intrusion upon seclusion] does not extend to non-physical places." *Hall v. Sargeant*, No. 9:18-CV-80748, 2019 WL 1359485, at *7 (S.D. Fla. Mar. 26, 2019) (holding that accessing email accounts and digital files is not "the kind of 'private quarter' or 'place' that can be the basis for invasion of privacy by intrusion under Florida law"); *Watts v. City of Hollywood*, 146 F. Supp. 3d 1254, 1268 (S.D. Fla. 2015) (dismissing invasion of privacy claim because accessing driver's license information from database was not an intrusion into a "place"); *Bradley v. City of St. Cloud*, No. 6:12–cv–1348–Orl–37TBS, 2013 WL 3270403, at *4–5 (M.D. Fla. June 26, 2013) (dismissing invasion of privacy claim because accessing the plaintiff's medical records without authorization was not an intrusion into a "place").

Here, the Complaint is void of any allegation suggesting Cleveland Clinic intruded into a private quarter or place. Plaintiffs merely allege "Cleveland Clinic intentionally intruded upon the seclusion and private affairs of Plaintiffs by implementing the Trackers on its Website that procured the interception" of Plaintiffs' information. Compl. ¶ 145. This is a classic "[t]hreadbare

recitals of the elements." *Iqbal*, 556 U.S. at 678. At best, Plaintiffs have alleged intrusion of a private activity (web browsing), which is insufficient to establish intrusion upon seclusion. The Website cannot, as a matter of law, be a private quarter or place of Plaintiffs because it is not a physical location. Thus, Cleveland Clinic could not have intruded into Plaintiff's seclusion and the Court must enter judgment on Count III in favor of Cleveland Clinic.

**2. Plaintiffs fail to allege an intrusion that is highly offensive.**

To demonstrate an intrusion that is highly offensive, a plaintiff must plausibly allege that the intrusion "is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Watts*, 146 F. Supp. 3d 1254, 1268 (S.D. Fla. 2015) (*quoting Stoddard v. Wohlfahrt*, 573 So. 2d 1060, 1062 (Fla. 5th DCA 1991)). "[T]he plaintiff must demonstrate as objectively as is possible, that the alleged misconduct is atrocious, and utterly intolerable in a civilized community." *Rebalko*, 552 F. Supp. 3d at 1333 (citations and quotations omitted). Whether the alleged intrusion rises to the level of actionable outrageousness is a question for "the judiciary–it is a matter of law, not a question of fact." *Stoddard*, 573 So. 2d at 1062–63 (holding trial court properly dismissed claim where plaintiff failed to allege conduct sufficiently outrageous to constitute intrusion). Accordingly, courts frequently dismiss invasion of privacy claims where the alleged conduct is not sufficiently outrageous as a matter of law. *See, e.g., Watts*, 146 F. Supp. 3d at 1268 (holding that access to the plaintiff's driver license information "cannot, as a matter of law, be said to be atrocious, and utterly intolerable in a civilized community") (internal quotations omitted); *Celestine v. Cap. One*, No. 17-20237-CIV, 2017 WL 2838185, at *4 (S.D. Fla. June 30, 2017) (dismissing invasion of privacy claim because "access of the [p]laintiff's credit information simply does not qualify as outrageous enough to satisfy this standard"); *Sprogis v. Suntrust Bank*, *No. 6:13--cv--365--Orl--37*, 2013 WL 2456090, at *2 (M.D. Fla. June 6, 2013) (dismissing

invasion of privacy claim that failed to allege sufficient facts to plausibly demonstrate conduct that went beyond "all possible bounds of decency"); *see also T.D. v. Piedmont Healthcare, Inc.*, No. 1:23-CV-5416-TWT, 2024 WL 3972984, at *2 (N.D. Ga. Aug. 28, 2024), *reconsideration denied*, No. 1:23-CV-5416-TWT, 2024 WL 5284883 (N.D. Ga. Dec. 10, 2024), *and appeal dismissed*, No. 25-10105-JJ, 2025 WL 1894802 (11th Cir. May 9, 2025) ("There is no intrusion upon privacy when a patient voluntarily provides personally identifiable information and protected health information to his or her healthcare provider.").

Here, although Plaintiffs contend that "Cleveland Clinic's intrusion upon Plaintiffs' private communications would be highly offensive to a reasonable person," Plaintiffs offer zero facts regarding the contents of *their* alleged communications for the Court to conclude or reasonably infer that Cleveland Clinic's conduct was sufficiently outrageous with respect to ***these*** Plaintiffs. Compl. ¶ 147. Nor can they. Cleveland Clinic's use of Adobe on the Relevant Webpages is subject to a DPA and a BAA, that forecloses any finding of outrageousness with respect to Adobe. *See, e.g.,* 45 C.F.R. § 164.502(e)(1)(i) (providing that an entity covered by HIPAA may disclose PHI to a third party that agrees to "appropriately safeguard the information"). With respect to the Programmatic Advertising Tools, of the Relevant Webpages, they are present solely on the public-facing Health Library page which does not collect or transmit PHI. The use of website tracking technologies are ubiquitous, and a reality of modern society. *See, e.g., In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 298 (3d Cir. 2016) ("[C]ourts have long understood that tracking cookies can serve legitimate commercial purposes."). Cleveland Clinic's limited use of such technologies with appropriate safeguards to prevent unlawful disclosure of PHI or other sensitive personal information is a far cry from being "atrocious and utterly intolerable in a civilized

community" or beyond "all possible bounds of decency." As a matter of law, the Court must enter judgment against Plaintiffs on Count III.

### C. Plaintiffs' Unjust Enrichment Claim (Count IV) Fails as a Matter of Law.

To state a claim for unjust enrichment, a plaintiff must allege they 1) "conferred a benefit on the defendant; 2) the defendant has knowledge of the benefit; 3) the defendant has accepted or retained the benefit conferred; and 4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1328 (11th Cir. 2012) (internal citations omitted). And, "[b]ecause unjust enrichment damages are economic damages, the amount of damages must be measurable and quantifiable." *Alvarez v. All Star Boxing, Inc.*, 258 So. 3d 508, 512 (Fla. 3d DCA 2018) (citations omitted). Cleveland Clinic is entitled to judgment on Count IV because Plaintiffs fail to plausibly allege they conferred any direct benefit on Cleveland Clinic and fail to allege cognizable economic damages.

#### 1. Plaintiffs fail to plead they conferred a benefit on Cleveland Clinic.

Plaintiffs fail to state a claim for unjust enrichment because their allegations regarding the alleged benefit conferred on Cleveland Clinic are wholly conclusory and unsupported. *See, e.g., Landis v. Quantum Cap. Glob., LLC*, No. 1:25-CV-20318-DPG, 2025 WL 3077643, at *4 (S.D. Fla. Nov. 4, 2025) (dismissing unjust enrichment claim because the alleged "benefit of the subject investment revenue" did not sufficiently allege the benefit conferred). The Eleventh Circuit's decision in *OJ Com., LLC v. Ashley Furniture Indus., Inc.*, 817 F. App'x 686, 692-93 (11th Cir. 2020) (applying Florida law) is particularly persuasive here. In *OJ*, the plaintiff attempted to assert an unjust enrichment claim based on the alleged conferral of benefits in the form of "marketing, advertising, and promoting" of the defendant's products. *Id.* at 692. In affirming dismissal of the claim, the court explained that the plaintiff "did not describe the nature of any retained marketing

benefit" and that the allegations regarding this purported benefit were merely a "formulaic recitation of the elements of a cause of action that will not do." *Id.* (internal quotations and citations omitted). Consequently, the "[p]laintiff's conclusory allegations of a conferred benefit, unsupported by specific factual allegations, do not state a claim for unjust enrichment." *Id.* at 693.

Here, like the deficient allegations in *OJ*, Plaintiffs' singular allegation about the benefit they allegedly conferred is that Cleveland Clinic "received a benefit from Plaintiffs through the interception of their valuable personal data." Compl. ¶ 151. However, the Complaint is void of any facts regarding specific data Plaintiffs supposedly provided to Cleveland Clinic, the alleged value of Plaintiffs' data, or any other facts supporting this allegedly conferred benefit. Without any of this basic information, Plaintiffs allegations ring hollow and fail to adequately allege any specific benefit conferred on Cleveland Clinic.

**2. Plaintiffs fail to plead cognizable economic damages.**

Judgment on the pleadings as to Count IV is also appropriate because Plaintiffs merely allege harm in the form of a loss of privacy and lost value in their data. *See* Compl. ¶ 154. Neither of these speculative and unsupported harms constitute economic damages that are measurable and quantifiable, as required to plead unjust enrichment. First, Plaintiffs' alleged damages in the form of loss of privacy are insufficient because Plaintiffs "plead[] no facts showing how the loss of privacy has impacted or damaged" them. *Baker v. Akumin Corp.*, No. 0:23-CV-62396, 2024 WL 1931480, at *6 (S.D. Fla. Apr. 16, 2024) (rejecting loss of privacy as an alleged harm where "allegations of injury based on loss of privacy are conclusory and inadequate"); *see also Manning v. Zumpano Patricios, P.A.*, No. 25-CV-23184, 2025 WL 3062563, at *7 (S.D. Fla. Nov. 3, 2025) (same). Plaintiffs' failure to allege any facts demonstrating an economic harm from lost privacy necessarily negates any inference that such harm is measurable and quantifiable to support unjust

enrichment damages. *See, e.g., Piedmont Healthcare, Inc.*, 2024 WL 3972984, at *4–5 (finding plaintiffs' "damages theories," including loss of privacy, "untenable" for unjust enrichment claim).

Second, Plaintiffs cannot proceed based on the alleged loss in value of their data because "if Plaintiff[s] had no intention to sell [their] data, then its decrease in value . . . would not harm Plaintiff[s] financially given there was previously no prospect of the data being sold at all." *Manning*, 2025 WL 3062563, at *7 (S.D. Fla. Nov. 3, 2025). Plaintiffs plead no facts suggesting they intended to sell their data or that Plaintiffs' data has actually decreased in monetary value as a result of Adobe Analytics or the Programmatic Advertising Tools. Courts routinely reject the same unsupported theories of loss in value of data as a cognizable harm. *See, e.g., Fraga v. UKG, Inc.*, No. 22-cv-20105, 2022 WL 19486310, at *12 (S.D. Fla. May 10, 2022) (holding that the plaintiffs failed to "adequately allege a devaluation of" their PII because the plaintiffs did not allege any facts suggesting a decreased ability to sell their PII); *In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243, 1257 (M.D. Fla. 2019) (rejecting lost monetary value of PII and PHI as a cognizable harm because the plaintiffs "have not alleged that their personal information has an independent monetary value that is now less than it was before"); *Provost v. Aptos, Inc.*, No. 1:17-CV-02120-ELR, 2018 WL 1465766, at *4 (N.D. Ga. Mar. 12, 2018) ("The Court is not persuaded by the hypothetical diminution of value propounded by Plaintiff. Plaintiff has failed to allege with particularity any facts explaining how her personal identity information is less valuable than it was before."). Consequently, the Court must enter judgment against Plaintiffs and in favor of Cleveland Clinic on Count IV.

## IV. CONCLUSION

For the foregoing reasons, the Court should enter judgment against Plaintiffs and in favor of Cleveland Clinic as to the entirety of the Complaint.

Dated: March 24, 2026

Respectfully submitted,

**HOLLAND & KNIGHT LLP**
*Counsel for Defendants The Cleveland Clinic Foundation and Cleveland Clinic Florida Health System Nonprofit Corporation*

*/s/ Caitlin F. Saladrigas*
Caitlin F. Saladrigas, Esq.
Florida Bar Number: 95728
**HOLLAND & KNIGHT LLP**
777 South Flagler Drive
Suite 1900 – West Tower
West Palm Beach, Florida 33401
561.833.2000 telephone
561.650.8399 facsimile
caitlin.saladrigas@hklaw.com

-&-

Alexander M. Dudley, Esq.
Florida Bar Number: 1017976
515 E. Las Olas Blvd.
Suite 1200
Fort Lauderdale, Florida 33301
954.525.1000 telephone
954.463-2030 facsimile
alexander.dudley@hklaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of March 2026, I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF filing system, and that a true and correct copy will be served via transmission of Notices of Electronic Filing generated by CM/ECF or by some other authorized manner on all counsel of record.

*/s/ Caitlin F. Saladrigas*
Caitlin F. Saladrigas